IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

MICHELE LAWSON,                           No. CIV S-07-2489-CMK

                  Plaintiff,

       vs.                                MEMORANDUM OPINION AND ORDER

COMMISSIONER OF SOCIAL
SECURITY,

                  Defendant.

_____/

              Plaintiff, who is proceeding with retained counsel, brings this action for judicial

review of a final decision of the Commissioner of Social Security under 42 U.S.C. § 405(g).

Pursuant to the consent of the parties, this case is before the undersigned for final decision on

plaintiff's motion for summary judgment (Doc. 19) and defendant's cross-motion for summary

judgment (Doc. 20).

/ / /

/ / /

/ / /

/ / /

# I. PROCEDURAL HISTORY

Plaintiff applied for social security benefits on March 17, 2005.  In the application, plaintiff claims that disability began on June 18, 2003.  Plaintiff claims that disability is caused by a combination of "degenerative joint disease of the right knee, degenerative disc disease of the cervical spine, cubital tunnel syndrome, epicondylitis of the right elbow, right shoulder strain, bilateral ulnar neuropathy, and right ankle strain."[1]  Plaintiff's claim was initially denied.  Following denial of reconsideration, plaintiff requested an administrative hearing, which was held on May 15, 2007, before Administrative Law Judge ("ALJ") Robert Milton Erickson.   In a July 26, 2007, decision, the ALJ concluded that plaintiff is not disabled based on the following relevant findings:

1. The claimant has not engaged in substantial gainful activity since June 18, 2003, the alleged onset date of disability;

2. The medical evidence establishes that the claimant suffers from degenerative joint disease of the right knee, degenerative disc disease of the cervical and lumbar spine, cubital tunnel syndrome, epicondylitis of the right elbow, right shoulder strain, bilateral ulnar neuropathy, and right ankle strain;

3. In combination, these impairments are severe;

4. These severe impairments do not meet or medically equal any impairment listed in the Listing of Impairments;

5. The claimant retains the residual functional capacity to occasionally lift up to twenty pounds, frequently lift and/or carry up to ten pounds, stand and/or walk for six hours in an eight hour day and sit for six hours in an eight hour day; the claimant is further limited to occasional climbing, kneeling, crouching, and crawling, and precluded from typing more than twenty five minutes at a time without a five minute break during which she may perform other activities; the claimant is unable to pull files from a file cabinet when the files are tightly fitted into the drawer; the files must be loosely fitted so that claimant can utilize a scooping style movement to retrieve files;

/ / /

---

[1]      In an Adult Disability Report completed June 10, 2005, plaintiff states that her impairments include:  "neck and back disc injuries; arm/wrist/hand injuries; and right knee."

6.    The claimant is capable of performing past relevant work as an eligibility worker; this work does not require the performance of work-related activities precluded by the claimant's residual functional capacity; and

7.    The claimant is not disabled.

After the Appeals Council declined review on September 20, 2007, this appeal followed.

## II.  SUMMARY OF THE EVIDENCE

The certified administrative record ("CAR") contains the following records, listed and summarized chronologically:

December 3, 2001          Chart note from Redding Family Medical Group (Ex. 15F; CAR 333).

Plaintiff was seen at Redding Family Medical Center for sinus problems and diagnosed with sinusitis and upper respiratory tract infection.  Plaintiff was prescribed medication and directed to rest.

July 31, 2002          Treating physician's report by Geoffrey P. Wiedeman, Jr., M.D., of Hand Surgery Associates (Ex. 7F; CAR 221-25).

Dr. Wiedeman saw plaintiff following an injury on June 26, 2001.  The doctor reported the following history:

The patient states that she fell from a broken chair when it collapsed, landing on her outstretched right hand and wrist.  She believes, however, that a few months prior she had "jammed my thumb" after which she had some discomfort, ultimately resolved.

The patient states that after this 26 June 2001 accident, the patient was seen at RIOH where x-rays were taken, apparently interpreted as within normal limits.  The patient was provided a splint and sent home.

The patient ultimately was evaluated in this office by D. Sullivan, M.D., orthopedic hand surgeon, on 14 December 2001, at which time she was complaining of pain and swelling over the ulnar aspect of the right thumb MP joint.  Dr. Sullivan elicited her history to include an additional episode when her right thumb was "jammed" while using a copy machine six weeks prior to the injury in question.  Dr. Sullivan documented the patient to be having constant numbness in the long, ring, and small fingers of both hands, with nocturnal awakening at least twice a week, and a displeasing

result from a left ulnar nerve operative procedure, done on 16 December 1997, when the patient demonstrated continued electrical study abnormalities and hypersensitivity. . . .

Plaintiff reported to Dr. Wiedeman that she has four areas of discomfort in the right wrist and that her hand is swollen on a constant basis.

On physical examination, Dr. Wiedeman observed full active and passive range of motion in the right elbow, without effusion, instability, or crepitus. He did, however, note "positive Tinel's tapping over the ulnar nerve." A surgical scar on the left elbow was well-healed. Dr. Wiedeman noted significant guarding of the medial elbow on the left. As to the right wrist, while plaintiff complained of discomfort when Watson's test was performed, Dr. Wiedeman did not observe any click, pop, snap, or other evidence of instability. Finkelstein's test was negative and there were no dorsal or volar wrist masses. Examination of the left writ revealed essentially the same results as for the right. As to the hands, the doctor noted diminished grip strength on the left, but otherwise normal findings.

Dr. Wiedeman diagnosed the following: (1) status post left ulnar serve neurolysis with medial epicondylectomy for suspected cubital tunnel syndrome; (2) right cubital tunnel syndrome; (3) marked residual ulnar nerve hypersensitivity about the left elbow; and (4) status post right wrist contusion with resultant right wrist pain, etiology unclear. The doctor concluded as follows:

At this time, I am unclear as to the exact cause of her discomfort anatomically. It does appear that she has sustained a work-related injury, however, where the onset of her symptoms was clearly in association with the fall.

With a normal bone scan I would not be too concerned that there is any type of significant injury which over time will not improve, acknowledging that it has been however a year. I am recommending that she be placed on Bextra to take for six weeks to assess the efficacy of this medication in diminishing her complaints and return to see me at that time. She is not yet permanent and stationary nor ratable.

/ / /

/ / /

September 5, 2002     Chart note from Redding Family Medical Group (Ex. 15F; CAR 332).

Plaintiff was seen for complaints of coughing.  It was recommended that plaintiff quit smoking.  She was instructed to take Robitussin DM and return if symptoms worsen.

October 4, 2002     Electrodiagnostic evaluation by Denette Dengler, M.D., of Physical Medicine and Rehabilitation (Ex. 7F; CAR 216-19).

An electrodiagnositic study was performed post left medial epicondylectomy and decompression of the left ulnar nerve across the cubital tunnel in September 1997.  On physical examination reflexes were symmetric.  While, Dr. Dengler reported an "abnormal [electrodiagnostic] study," she stated that there was no evidence of median nerve dysfunction across the bilateral wrists and no evidence of bilateral radial sensory nerve dysfunction.

November 25, 2002     Chart note from Redding Family Medical Group (Ex. 15F; CAR 332).

Plaintiff was seen again for respiratory complaints.  The chart note indicates that a "viral illness" was diagnosed.  Plaintiff was provided a flu shot and instructed to rest and return for a scheduled appointment.

December 4, 2002     Agreed medical examination report by Geoffrey P. Wiedeman, Jr., M.D., of Hand Surgery Associates (Ex. 7F; CAR 198-213).

Dr. Wiedeman re-evaluated plaintiff in the capacity of an agreed medical examiner.  The doctor's report outlines plaintiff's extensive history of medical complaints and treatment back to late 1995.  Dr. Wiedeman reported that, after his July 31, 2002, examination, he saw plaintiff again on September 11, 2002.[2]  At that visit, plaintiff reported that she had been taking the recommended medication but that her condition had not improved.  Dr. Wiedeman reported that his physical examination on September 11, 2002, was unchanged from the July 31,

---

[2]     The CAR does not contain a separate record of this visit.

2002, examination and he recommended at that time that plaintiff take Vioxx and obtain "repeat electrical studies."[3]  Dr. Wiedeman reported that he saw plaintiff again on October 22, 2002.[4]  At that time plaintiff's symptoms had not changed and Dr. Wiedeman opined that plaintiff "should engage in no grasping of wide-based files over 1/2-inch, and to continue her anti-inflammatory medications."

As to plaintiff's current symptoms, Dr. Wiedeman reported:

> At this time, the patient states that her symptoms on the left are unchanged from those documented at the time of my 6 December 2000 evaluation.[5]
>
> On the right, she is complaining now of lateral elbow pain on a constant basis, which is exacerbated with gripping.  She has pain over the medial elbow 50 percent of the time and questions what exactly precipitates that discomfort.  She complains of numbness in the long, ring, and small fingers, exacerbated with elbow flexion and activities such as driving and occasional keyboard work.  The patient does utilize a tilted keyboard which she finds is helpful in diminishing her complaints.  She perceives a weakness of grip.  She complains of dorsal wrist pain on the right on a constant basis, exacerbated with dorsiflexion.  She notes occasional swelling, pointing to the region of the distal ulna.  She has slight pain in the region of the thumb and thenar eminence.  She perceives a weakness of grip.

Dr. Wiedeman performed a new physical examination and offered the following discussion:

> Based on this patient's history, physical examination, and records review, it is my impression that she has indeed sustained a work-related injury to both elbows on a cumulative trauma basis as I had previously mentioned on my original 6 December 2000 report.  I do not believe that the patient's symptoms with respect to her medial elbows have significantly worsened since my 6 December report.  Specifically, the fall of 27 June 2001[6] did not worsen that level of disability.  She remains permanent and stationary

---

[3]     The "repeat electrical studies" were conducted by Dr. Dengler on October 4, 2002. The CAR does not contain records of any original electrodiagnostic studies.

[4]     Again, the CAR does not appear to contain any separate reports for this visit.

[5]     The Car does not contain a report by Dr. Wiedeman of the December 2000 evaluation.

[6]     In his July 31, 2002, report, Dr. Wiedeman reported that the June 2001 fall occurred on the 26th.

1    in that regard to those injuries.[7]

2    With respect to the 27 June 2001 injury, it was indeed a work-related
     injury and at this time the patient can be considered permanent, stationary,
3    and ratable.  The following subjective and objective factors of disability
     will incorporate the subtraction method not currently mentioning her
4    previous disability attributable to her cumulative trauma but solely that
     level of disability to the 27 June 2001 injury, which has resulted in some
5    pain over the right lateral elbow and radial wrist.

6    Dr. Wiedeman then reported the following objective findings supporting his conclusion:

7    There is tenderness to palpation over the lateral epicondyle.  There is
     tenderness to palpation dorsally over the dorsal ulnar wrist.  The patient's
8    grip is diminished by 20 percent in comparison to her earlier grip studies
     of 6 December 2000.

9

10   As to work restrictions, Dr. Wiedeman stated:

11   The patient should be authorized to work with a volar wrist splint in place
     should she find that to be beneficial on a voluntary basis for this particular
12   injury of 27 September 2001.[8]

13   Dr. Wiedeman concluded that vocational rehabilitation was not necessary because plaintiff could

14   "continue to engage in her usual and customary duties with restrictions to require her to work at a

15   proper ergonomically engineered workstation and take a five minute break every 25 minutes

16   while engaged in constant date entry."  The doctor did not feel that any further treatment was

17   necessary other than use of a splint and anti-inflammatory medications.  The doctor added:

18   Incidentally, the patient[] wished me to render an opinion on a job for
     Shasta County Department of Social Services Employment and Training
19   Worker II, which I reviewed and indicated to her that it seemed reasonable
     that she be permitted to perform this job, as the patient also agreed that she
20   could so do.  She is to do no wide-based grasping.

21   / / /

22   / / /

23

24        [7]      In his July 31, 2002, report, Dr. Wiedeman reported that plaintiff was <u>not</u> yet
     permanent and stationary.
25
         [8]      Presumably, Dr. Wiedeman intended to reference the June 2001 injury as there is
26   no mention of further injury in September 2001.

7

January 31, 2003         Orthopedic evaluation by Joel W. Renbaum, M.D., of
                        Orthopedic Evaluation Center (Ex. 8F; CAR 255-73).

Dr. Renbaum examined plaintiff as an agreed medical examiner.  He evaluated plaintiff "with regard to problems she is having in her right knee, wrist, ankle, and shoulder." Dr. Renbaum reported the following history chronology:

1990 – Plaintiff "jammed" her right knee into the corner of her desk.

1991 – Plaintiff underwent arthroscopy of the right knee, but had no improvement and very slow recovery.  Her knee problems remained "stable" over the next ten years.

1997 or 1998 – Plaintiff was diagnosed with ulnar neuropathy in both elbows. Surgery on the left did not result in improvement and plaintiff declined surgery on the right.

June 2001 – Plaintiff "jammed" her right thumb on a copy machine at work.  On the same day, she also sustained injuries to her right wrist, knee, ankle, and shoulder when her ergonomic chair broke and threw her forward.  She sought treatment the following day.

November 2001 – Arthroscopy was recommended for the right knee.  Plaintiff declined.

December 2001 – Hand surgery consultation with Dr. Sullivan.

October 2002 – EMG and nerve conduction studies revealed slow motor nerve conduction velocity across the left elbow.

Plaintiff told Dr. Renbaum that, since the June 2001 injuries, she has not been able to reach overhead with her right shoulder.  Dr. Renbaum reported that plaintiff has had no specific treatment for the shoulder.

As to plaintiff's complaints at the time of his examination, Dr. Renbaum reported:

At the present time the patient complains of pain in her right knee, present daily, with burning.  She notes occasional discomfort in her right wrist and right thumb.  She notes occasional aching in her right ankle.  She notes limited motion of her right shoulder.

/ / /

/ / /

Based on his physical examination and review of records, Dr. Renbaum concluded: "It is my opinion that the patient has reached a permanent and stationary status." As to specific areas, the doctor reported:

> 1. <u>Right Knee</u> – Objectively, the doctor observed healed nick incisions, mild tenderness over the medial greater than lateral joint lines, trace tenderness to patellar compression, trace grating on the undersurface of the patella. He estimated plaintiff's work disability as that precluding prolonged weight bearing, repetitive kneeling, and repetitive squatting.

> 2. <u>Right Wrist</u> – Objectively, Dr. Renbaum found decreased sensation in the ring and little fingers, a positive Tinel at the ulnar wrist, a small non-tender ganglion over the dorsum of the wrist. He estimated plaintiff's work disability as that precluding repetitive gripping, grasping, pushing, pulling, pinching.

> 3. <u>Right Shoulder</u> – Objectively, the doctor noted mild generalized tenderness over the anterior and posterior capsule, and mildly decreased motion of the shoulder in abduction and forward flexion. Dr. Renbaum did not provide any estimation regarding work limitations associated with plaintiff's right shoulder problems.

> 4. <u>Right Elbow</u> – The doctor concluded that plaintiff was precluded from using the right upper extremity overhead, but did not list supporting objective findings.

> 5. <u>Right Ankle</u> – Objectively, Dr. Renbaum noted "anterolateral joint line," but did not note any specific work limitations.

Overall, Dr. Renbaum concluded that, with some limitations, plaintiff could continue in her usual and customary work activities and that vocational rehabilitation was not indicated.

> <u>February 24, 2003</u>    Treating physician's report by Geoffrey P. Wiedeman, Jr., M.D., of Hand Surgery Associates (Ex. 7F; CAR 196-97).

In his progress report, Dr. Wiedeman noted the following interim history since his last examination:

> Since my last evaluation, the patient is continuing to work but finds that she is getting little cooperation getting other employees to help her make her job easier by condensing or thinning the files. The patient has developed her own technique for scooping the files to that she does not have to grasp in a wide-based pinched prehensile fashion. [¶] The patient states she chose to stop the Bextra as she felt it was no longer efficacious.

Dr. Wiedeman reported that plaintiff's symptoms remained unchanged.  The doctor reported the following objective findings on physical examination:

> On physical examination today, the right elbow reveals a full active and passive range of motion without effusion, instability, or crepitance.  There is a positive Tinel's sign tapping over the ulnar nerve at the cubital tunnel.

> The hand and wrist reveals a full active and passive range of motion without effusion, instability, or crepitance.  There is a positive thumb CMC axial grind.  Two-point discrimination is 5mm in all digital nerves. Median and ulnar intrinsics are intact.

Dr. Wiedeman stated that plaintiff could return to work "with no lifting of charts in a pinching fashion but scooping charts only."

June 18, 2003    Doctor's first report of injury by Albert G. Lui, M.D., of Redding Industrial and Occupational Health (Ex. 1F; CAR 100-02).

Dr. Lui reported on a new work injury.  In his report, the doctor recited the following history:

> 58-year-old female Caucasian welfare social service worker who again fell forward out of a chair that is adjustable for her back.  Old work comp. injury a couple of years ago.  Sees a Sacramento orthopedist right wrist or hand specialist still for that.  History of fracture back maybe 25 years ago with surgery.  Two days ago was working in the office in the chair when the chair actually fell forward while she was leaning forward to check on a calendar.  Her chair can [sic] down her right knee, she reset with a right wrist to catch herself and hit the back of her associate, and twisted her back.  Off work past two days secondary to pain. . . .

Dr. Lui opined that plaintiff could return to her normal work, with the following restrictions:

> 1.    May not lift, pull, push, or carry more than 10 pounds frequently or repetitively at any time;

> 2.    No prolonged or repetitive bending, stooping, walking, standing, climbing, kneeling, or squatting;

> 3.    Limited work requiring the use of the right arm and leg;

> 4.    Sedentary job for one week; and

> 5.    Must be able to rest frequently as needed.

///

July 8, 2003            Chart note from Redding Family Medical Group (Ex. 15F; CAR 332).

Plaintiff was seen following a work accident on June 16, 2003, "when she was moving forward on a wheeled chair and it collapsed."  Objectively, the examining doctor noted full range of motion of the neck with tenderness posteriorly in the mid cervical spine, and full range of motion of the arms with tenderness in both wrists and the left elbow with normal reflexes.  Plaintiff's back was tender in the paraspinous muscle areas of the lumbar spine.  The doctor assessed "[w]ork-related neck, lower back, bilateral wrist, and right knee pain of unclear etiology."

July 22, 2003           Chart note from Redding Family Medical Group (Ex. 15F; CAR 331).

Plaintiff was seen again two weeks later for follow-up care.  Plaintiff reported that the "pain isn't any better."  The note indicates that x-rays of the hand show generalized arthritis and x-rays of the right knee are normal.  Plaintiff was to remain off work through August 15, 2003.

August 5, 2003          Treating physician's report by Geoffrey P. Wiedeman, Jr., M.D., of Hand Surgery Associates (Ex. 7F; CAR 192-93).[9]

Dr. Wiedeman provided another report following an examination of plaintiff.[10] He reported that plaintiff "has continued to work at her usual and customary duties following the work preclusions as were outlined and as refined in response to the letters from . . . the labor representative from UPEC."[11]

---

[9]    Pages 2 through 4 of this report are not part of the CAR.

[10]    The doctor states that his most recent evaluation was on April 7, 2003.  The CAR, however, contains no record of such an evaluation.

[11]    From this it appears that plaintiff was working as of August 5, 2003, even though the doctor at Redding Family Medical Group stated she should remain off work until August 15, 2003, and plaintiff stated in her application for benefits that she became disabled in June 2003.

August 7, 2003     Chart note from Redding Family Medical Group (Ex. 15F; CAR 331).

Plaintiff reported that medication (Norco) helped her sleep at night and that she only occasionally used it during the day to relieve pain.  The doctor instructed plaintiff to remain off work through September 15, 2003.

August 25, 2003     Treating physician's report by Geoffrey P. Wiedeman, Jr., M.D., of Hand Surgery Associates (Ex. 7F; CAR 189-91).

Dr. Wiedeman reported that plaintiff remained off work since his last evaluation and that plaintiff's pain has increased.  He recommended that plaintiff remain off work.

September 5, 2003     Treating physician's report by Brian S. Edkin, M.D., of Northern Bone and Joint Center (Ex. 4F; CAR 113-14).

Dr. Edkin performed an orthopedic consultation in relation to the June 16, 2003, work injury.  On physical examination, plaintiff's right knee revealed tenderness over the medial joint line, no effusion, full normal range of motion with pain at full flexion, negative McMurray's, and normal stability.  Dr. Edkin stated that he needed to obtain x-rays to fully evaluate plaintiff's situation.

September 11, 2003    MRI of plaintiff's right knee (Ex. 2F; CAR 103).

Jon A. Hohmeister, M.D., reported his findings following an MRI of plaintiff's right knee.  The doctor reported no anatomic abnormality.

September 11, 2003    Chart note from Redding Family Medical Group (Ex. 15F; CAR 330).

This chart note is entitled "Work Comp Progress Report."  Plaintiff reported with right knee, right wrist, and neck pain.  According to plaintiff, her neck pain had not improved.  She stated that it hurts when she works on the computer.[12]

---

[12]    The chart note indicates:  "Currently off work through 9-15-03" though she indicated she feels pain when working at the computer.

1       September 22, 2003    MRI of plaintiff's cervical spine (Ex. 3F; CAR 104).

2       Dr. Hohmeister reported on an MRI of plaintiff's cervical spine. He reported the

3  following impressions:

4       1.     Some desiccation of the disc, height loss, and broad-based posterior
   annular bulge at C5-6. There is a possible rent in the posterior annulus at
5       C5-6, and there appears to be contact with the cervical cord without
   compression of the cord. Degree of posterior protrusion is slightly more
6       pronounced at C5-6 than seen on the prior study of August 1997;[13] and

7       2.     Disc degeneration at C6-7 with loss of height. There is posterior disc
   protrusion which is more pronounced posterolaterally to the left where
8       there may be contact with the cervical cord without compression of the
   cord. Findings are C6-7 are similar to prior study.

9

10      October 1, 2003     Occupational/physical therapy initial evaluation by
   Suzanne Cresswell, P.T., O.T., C.H.T., of Cresswell
11      Physical Therapy (Ex. 5F; CAR 130).

12      On October 1, 2003, Ms. Cresswell reported on her initial visit with plaintiff on

13 September 24, 2003. At that time, plaintiff reported "'extreme' pain in the right wrist with

14 inability to participate in activities of daily living or work tasks." Ms. Cresswell noted the

15 following "significant objective findings":

16      1.     Range of motion of right wrist roughly 20% of what expected;

17      2.     Weakness grading with manual muscle testing to the wright wrist;

18      3.     Palpable tenderness of the dorsal and volar right wrist region;

19      4.     Increased muscle tone in the volar and dorsal right wrist and forearm;

20      5.     Grip strength on the right was eight pounds; and

21      6.     Pinch strength on the right was one pound.

22 Ms. Cresswell's treatment plan consisted of physical therapy three times per week for four

23 weeks, home exercise, fine-motor re-education, activities of daily living re-education, and

24 relaxation techniques.

25

26      [13]    The CAR does not contain any record of the 1997 study.

1        <u>October 5, 2003</u>        Treating physician's report by Geoffrey P. Wiedeman, Jr.,
2                                    M.D., of Hand Surgery Associates (Ex. 7F; CAR 186-87).

3            Dr. Wiedeman prepared a report outlining his comments following a review of

4 records from September 2003. Specifically, the doctor reviewed the recent MRI reports. He

5 stated that the results of the MRIs did not change his original opinions "as these notes do not

6 refer to [plaintiff's] upper extremity complaints."

7        <u>October 6, 2003</u>        Occupational/physical therapy progress report by  Suzanne
8                                    Cresswell, P.T., O.T., C.H.T., of Cresswell Physical
                                    Therapy (Ex. 5F; CAR 128-29).

9            Ms. Cresswell reported to Dr. Wiedeman on plaintiff's progress in physical

10 therapy, noting that the range of motion in plaintiff's right wrist had increased from 20% of

11 expected normal to 40% of expected normal. Right wrist weakness had decreased, but muscle

12 tone was unchanged (although Ms. Cresswell reported that plaintiff had achieved 10% of her

13 goals with respect to muscle tone). Subjectively, plaintiff continued to report "exquisite pain"

14 and difficulty with activities of daily living, "such as meal preparation and use of eating utensils

15 as well as light housework."  Ms. Cresswell recommended additional therapy sessions.

16        <u>October 8, 2003</u>        Chart note from Redding Family Medical Group (Ex. 15F;
17                                    CAR 329-30).

18            Plaintiff reported with right wrist, neck, and low back pain. She reported that the

19 pain in her neck is not improving. Objectively, the doctor noted fair range of motion of the neck

20 and tenderness in the low back. Reflexes were normal. The note indicates that plaintiff is

21 "[c]urrently off work through 11/15/03."

22 / / /

23 / / /

24 / / /

25 / / /

26 / / /

1       <u>October 29, 2003</u>     Letter from Ralph C. Magnuson, P.T., of  Cresswell

2                                    Physical Therapy (Ex. 5F; CAR 127).

3       Mr. Magnuson reported on physical therapy related to plaintiff's low back and

4 shoulder problems as follows:

5       Objective findings of the cervical and lumbar spine show 40% of expected

6       normal range throughout the cervical spine and 25% of the expected
ranges throughout the lumbar spine.  Both shoulder joints were examined

7       and demonstrate 50% of expected normal on the right and 65% of
expected normal on the left.  Trunk and lower extremity strength is graded

8       roughly 4/5.  Palpation reveals increased tone and tenderness throughout
the upper cervical paraspinals, levator scapulae, and rhomboid

9       musculature as well as throughout the thoracolumbar paraspinals.

10       <u>November 3, 2003</u>     Occupational/physical therapy progress report by  Suzanne
Cresswell, P.T., O.T., C.H.T., of Cresswell Physical

11                                      Therapy (Ex. 5F; CAR 125-26).

12       Ms. Cresswell reported to Dr. Wiedeman on plaintiff's progress following 13 of

13 24 pre-authorized physical therapy sessions.  Range of motion of plaintiff's right wrist was

14 unchanged from the previous report at 40% of expected normal.  Weakness on manual muscle

15 testing, muscle tone, and pinch strength were also unchanged.  Grip strength, which was initially

16 eight pounds on September 24, 2003, had improved to 20 pounds by October 6, 2003, and further

17 improved to 25 pounds by most recent session.

18       <u>November 11, 2003</u>    Treating physician's report by Geoffrey P. Wiedeman, Jr.,
M.D., of Hand Surgery Associates (Ex. 7F; CAR 184-85).

19

20       Dr. Wiedeman prepared a progress report following his examination.  He reported

21 the following "interim history":

22       Since my last evaluation, the patient indicates that she did undergo the
MRI of her knee on 11 September 2003, which showed no evidence of a

23       meniscal pathology.  She is yet to see Dr. Edkin, her orthopedic surgeon
for her knee, the visit to take place on 25 November 2003, who more

24       likely than not will not be considering her as a candidate for knee
arthroscopy based on the normal MRI.

25

26 ///

She is continuing to see Dr. Harden, who the patient states continues to certify her off work for her neck, the patient stating that she does have a concomitant neck claim filed.  She indicates that treatment to date included a cervical MRI performed in September 2003, which she states revealed "four bulging discs."  The patient states that she has been referred to therapy and has been placed on Norco by Dr. Harden.  The patient states that she has not been referred elsewhere for specialty care for her neck but may request of Dr. Harden that she be sent to Dr. Hartzog per my comment in my 13 October 2003 PR-2 report.

She is continuing to work at Cresswell Therapy on a therapeutic program for her right wrist at my direction, to observe consistency of symptoms, which does include some work hardening and weaning from the splint.[14]  Reports have been most recently received as of 3 November 2003 and do not indicate that she is improving in most parameters but continues to experience right wrist pain.

> November 12, 2003   Chart note from Redding Family Medical Group (Ex. 15F; CAR 329).

The doctor indicated that physical therapy "hasn't helped her lower back or neck."  On physical examination, decreased range of motion to flexion and extension of the neck and tenderness in the lower lumbar spine were noted.  Reflexes were found to be normal.  The note indicates that plaintiff would be off work through March 2004.

> November 25, 2003   Treating physician's report by Brian S. Edkin, M.D., of Northern Bone and Joint Center (Ex. 4F; CAR 109-10).

Plaintiff was seen for re-evaluation of her right knee.  She reported continued intermittent locking, usually with arising and occasionally with walking.  Plaintiff stated that her pain is predominantly medial with some infrapatellar pain.  On physical examination, Dr. Edkin noted that plaintiff is tender along the medial femoral condyle and that palpation of the plica bands produced pain.  McMurray's test was negative and Dr. Edkin reported a stable knee with no effusion.  Dr. Edkin concluded that, while plaintiff has some fluid around the medial meniscus posteriorly, "she has no evidence of meniscus tear by MRI."  Dr. Edkin recommended

---

[14]     It is unclear whether "work hardening" indicates that, as of November 2003, plaintiff was still working.

corticosteroid injections and diagnostic arthroscopy if plaintiff showed any improvement.

November 26, 2003     Report by Suzanne Cresswell, P.T., O.T., C.H.T., of
                      Cresswell Physical Therapy (Ex. 5F; CAR 124).

Ms. Cresswell reported to Dr. Wiedeman on the 23rd of 24 pre-authorized sessions. Plaintiff reported a reduction in right wrist ulnar pain, but persistent right hand and thumb pain. Plaintiff stated that she could not pump gas as a result of the hand and thumb pain. On examination, increased muscle tone in the wrist was noted and range of motion was 50% of expected normal (an increase from the last report following the 13th session, when range of motion was 40% of expected normal).

January 6, 2004     Treating physician's report by Geoffrey P. Wiedeman, Jr.,
                    M.D., of Hand Surgery Associates (Ex. 7F; CAR 178-83).

Dr. Wiedeman re-evaluated plaintiff and submitted a progress report. According to Dr. Wiedeman, since his last evaluation plaintiff had undergone a repeat bone scan. Dr. Wiedeman reported that this scan showed that plaintiff's "condition was perhaps even slightly less abnormal than the comparative study done on 15 August 2003. . . ." As to plaintiff's neck problems, Dr. Wiedeman reported that plaintiff was examined by Dr. Hartzog in December 2003 and that Dr. Hartzog felt plaintiff's MRI changes were "quite compatible with age-related degenerative changes." According to Dr. Wiedeman, Dr. Hartzog concluded that plaintiff "would be capable of carrying out her normal and usual work activities." Plaintiff reported to Dr. Wiedeman that her physical therapy sessions had ended, with her last visit in November 2003. She reported that, since engaging in physical therapy, she was experiencing pain in her thumb.

Dr. Wiedeman performed a physical examination and reported:

. . . I still remain somewhat confused with respect to the patient's diagnosis from her wrist contusion. This confusion is even more complicated by her current symptoms of discomfort in the region of the base of the thumbs.

///

> I do not have a good explanation currently of the pain that the patient is experiencing in the region of the base of her thumb and how that might be directly related to her therapy.

He concluded that plaintiff could return to work "absent the . . . other diagnoses" but that a solution needs to be crafted regarding use of her thumb.  He stated that he would request a site visit by an ergonomic specialist to "attempt to decide what modifications might be recommended to permit her to return back to work, not having to do any wide-based pinching or vigorous scooping actions to secure the files."  As to plaintiff's current work status, he acknowledge that she was off work "for other than her upper extremity complaints" and that the ergonomic evaluation would be required in order to assess her hand-related work preclusions.

<u>January 14, 2004</u>     Chart note from Redding Family Medical Group (Ex. 15F; CAR 329).

The doctor noted a decreased range of motion to flexion, extension, and side-to-side rotation of the neck with normal reflexes and good strength in the arms.  Tenderness in the posterior surface of the neck was noted.  It was recommended that plaintiff remain off work through June 1, 2004.

<u>January 27, 2004</u>     Treating physician's report by Brian S. Edkin, M.D., of Northern Bone and Joint Center (Ex. 4F; CAR 107-08).

Dr. Edkin saw plaintiff regarding continued right knee discomfort.  He reported:

> I think the patient exhibits enough findings that there is likely something intraarticular to deal with.  The MRI scan was again reviewed and other than some fluid behind the medial meniscus that I would consider abnormal, there is no definite findings consistent with a medial meniscal tear.  However, she at least has a irritable plica, has not responded to non-surgical treatment, is far enough out to where spontaneous healing should have occurred for most extraarticular issues, and I think it is appropriate to proceed with a diagnostic and therapeutic arthroscopy at this time. . . .

///

///

///

March 1, 2004          Chart note from Redding Family Medical Group (Ex. 15F; CAR 328).

Plaintiff reported that her father had died and that she was "having to tend for her Mom in Washington."  She also reported that her neck and back pain were not improved.  On physical examination, decreased range of motion in the neck was noted secondary to pain.  The note indicates that plaintiff would remain off work through July 1, 2004.

March 17, 2004          Ergonomic evaluation by Suzanne Cresswell, P.T., O.T., C.H.T., of Cresswell Physical Therapy (Ex. 5F; CAR 117-21).

Ms. Cresswell prepared an ergonomic evaluation of plaintiff's workplace.  As to handling files, Ms. Cresswell recommended that plaintiff be provided assistance "on a periodic basis to ensure her files remain small and file drawers uncluttered."  She recommended no more than a one-inch depth of files to "avoid wide-based pinching."  She also recommended "assistance maintaining file cabinet drawers loose enough to reduce need for vigorous scooping actions of files."  She also recommended:

> Further team problem solving is required regarding the limited reach envelope, limited tolerance to typing, limited tolerance to standing, pain on transition from sit to stand, right knee discomfort upon walking and/or changing walking directions, as well as Ms. Lawson's difficulty carrying files due to right arm pain and left pain/weakness (for years).

March 29, 2004          MRI of plaintiff's lumbar spine (Ex. 6F; CAR 144-45).

Jerry Schulte, M.D., reported on an MRI of plaintiff's lumbar spine.  The doctor reported central posterior protrusions of the L1-2 and the L5-S1 discs, degeneration of the L1-2 and the L5-S1 discs, mild central canal stenosis and bilateral narrowing of the neural foramina at the L4-5 and the L5-S1 levels, and anterior degenerative spurring at the L5-S1 level.

/ / /

/ / /

/ / /

/ / /

| | |
|---|---|
| <u>May 22, 2004</u> | Orthopedic evaluation by Joel W. Renbaum, M.D., of Orthopedic Evaluation Center (Ex. 8F; CAR 246-54). |

Dr. Renbaum examined plaintiff as an agreed medical examiner.  Plaintiff reported that she last worked on July 8, 2003.[15]  On physical examination, which appears to have been limited to plaintiff's right knee, Dr. Renbaum noted essentially normal findings.  He opined that plaintiff's work ability precluded "prolonged weight bearing, repetitive kneeling, repetitive squatting, and repetitive climbing."  He added:

> I am unable to explain why the patient is unable to return to her regular work activities assuming some modifications are made to her work station. She appears to primarily have a desk job.  Based on her knee condition alone, I do not feel that she is a candidate for vocational rehabilitation.

| | |
|---|---|
| <u>June 1, 2004</u> | Chart note from Redding Family Medical Group (Ex. 15F; CAR 327). |

Plaintiff reported that anti-inflamatories and muscle relaxants have not eased her pain.  She also reported developing a "tolerance" for Norco.

| | |
|---|---|
| <u>July 15, 2004</u> | Agreed medical examination report by Geoffrey P. Wiedeman, Jr., M.D., of Hand Surgery Associates (Ex. 7F; CAR 148-77). |

Dr. Wiedeman indicated that he initially saw plaintiff in the capacity of agreed medical examiner, but took over on July 31, 2002, as plaintiff's treating physician following the June 26, 2001, injury.  In recounting plaintiff's medical history, Dr. Wiedeman noted that, by June 21, 1996, plaintiff's symptoms had not improved and surgical intervention was recommended.  However, by July 1997, plaintiff was "not particularly interested in undergoing operative intervention. . . ."  Plaintiff was off work in December 1997 and Dr. Wiedeman noted that, by March 1998, plaintiff was "making minimal progress in . . . therapy. . . ."  Plaintiff nonetheless continued therapy through September 1998 and was authorized to return to full work

---

[15]     Plaintiff alleged in her social security application that she became unable to work on June 18, 2003.

duty by December 1998.

Dr. Wiedeman reported that plaintiff continued working through November 2000 when she sustained another injury, this time to her thumb.  When Dr. Wiedeman first saw plaintiff in December 2000, plaintiff did not report her recent right thumb injury.  Rather, in December 2000 plaintiff complained of elbow pain.  Dr. Wiedeman reported that plaintiff sustained another injury in June 2001, this time to her right wrist, ankle and knee.  Dr. Wiedeman also reported that, on January 21, 2002, Ms. Cresswell outlined plaintiff's physical therapy progress, noting that plaintiff had attended only three out of seven sessions.  By February 2002, plaintiff had been using a wrist splint which resulted in improvement in her pain symptoms.  Dr. Wiedeman also reported that, by October 2002, plaintiff was still working full duty and utilizing her right wrist.

By May 2003, plaintiff was re-considering surgery.  On June 16, 2003, plaintiff sustained yet another injury to her right knee.  Dr. Wiedeman reported that a September 11, 2003, MRI of plaintiff's right knee was normal.  Dr. Wiedeman recounted his evaluation of plaintiff on September 17, 2003, and noted that she was off work and using a splint on her right wrist.  In October 2003, plaintiff told Dr. Wiedeman that the wrist splint had made a "big difference" and resulted in diminished discomfort.

Based on a new physical examination and review of plaintiff's records, Dr. Wiedeman outlined the following discussion:

> Based on this patient's history and physical examination and records review, it is my impression that the patient has sustained a work-related injury to both upper extremities and is permanent, stationary, and ratable.
>
> Regarding her left upper extremity I would make no changes regarding any of her disability from those factors listed on my original AME carried out on 6 December 2000, the patient being declared permanent and stationary at that time and remains so.
>
> While she may have had temporary worsening of symptoms in the left upper extremity, any such worsening was never recorded in the records to be dramatic and clearly, by the patient's own admission, her symptoms and disability are no worse now than at the time that I did declare her to be

permanent and stationary.

I unfortunately do not have a more definite diagnosis to offer regarding the source of her additional symptoms in the right hand and wrist present over and above those noted at the time of my original evaluation. . . .

Objectively, Dr. Wiedeman concluded that plaintiff has a 40% diminished grip strength, presumably in the right wrist.  Dr. Wiedeman also concluded that, "strictly from her bilateral elbow and hand complaints," plaintiff should not engage in heavy lifting.

> <u>July 27, 2004</u>        Chart note from Redding Family Medical Group (Ex. 15F; CAR 325).

Plaintiff apparently reported for a routine physical examination which revealed normal findings in plaintiff's neck, back, and extremities.  Specifically, the doctor noted "full ROM of the upper & lower extremities w/o clubbing, cyanosis, or edema."  Plaintiff was found to be neurologically intact.

> <u>September 29, 2004</u>   Chart note from Redding Family Medical Group (Ex. 15F; CAR 324).

The doctor completed a "Work Comp Progress Report" and indicated a decreased range of motion in the neck and tenderness in the lower back.

> <u>October 9, 2004</u>     Chart note from Redding Family Medical Group (Ex. 15F; CAR 324).

Plaintiff reported with swelling around the gums and was diagnosed with gingivitis and instructed to follow up with her dentist.

> <u>December 11, 2004</u>   Orthopedic evaluation by Joel W. Renbaum, M.D., of Orthopedic Evaluation Center (Ex. 8F; CAR 228-45).

Dr. Renbaum performed an orthopedic evaluation in the capacity of agreed medical examiner.  Plaintiff was evaluated regarding problems in her neck, right shoulder, left arm, back and right ankle.  At the time of the evaluation, plaintiff complained of pain in her neck radiating into both upper extremities as well as pain in her lower back that did not radiate to her

22

lower extremities.  Plaintiff reported ongoing pain in her right knee and left elbow and hand.[16]  In addition, plaintiff reported pain in her right ankle.  Dr. Renbaum noted that plaintiff's current treatment consisted of taking Norco and Lexapro, as well as the use of neck, knee, wrist, ankle, and thumb braces and/or splints.  Following his physical examination and records review, Dr. Renbaum concluded that plaintiff was permanent and stationary.

Dr. Renbaum performed a new physical examination and reviewed plaintiff's medical records.  The doctor noted the following findings as to various areas:

1.  <u>Cervical and Lumbosacral Spine</u> – Objectively, he noted tenderness to palpation over the cervical, trapezius, and scapular musculature.  He also noted decreased range of motion of the neck and back, and tenderness over the lower lumbar spine.  He estimated that plaintiff was precluded from heavy work to very heavy work.

2.  <u>Right Knee</u> – Objectively, Dr. Renbaum noted tenderness over the medial and lateral joint lines, trace tenderness to patellar compression, and trace grating of the undersurface of the patella.  He assessed plaintiff as being precluded from prolonged weight bearing, as well as repetitive kneeling, squatting, and climbing.

3.  <u>Right Shoulder</u> – Objectively, Dr. Renbaum found generalized tenderness to palpation, mildly decreased range of motion, and positive impingement.  He assessed plaintiff as being precluded from use of the right upper extremity overhead.

4.  <u>Right Ankle</u> – Objectively, the doctor noted mild tenderness over the medial and lateral joint lines.  He did not assess any specific limitations associated with plaintiff's right ankle.

Overall, Dr. Renbaum concluded that plaintiff "would be able to return to her usual and customary work activities if a few modifications were made. . . ."  Dr. Renbaum did not feel that plaintiff was a surgical candidate.

/ / /

/ / /

/ / /

---

[16]     Dr. Renbaum did not address these complaints because they were addressed in Dr. Wiedeman's recent report.

December 21, 2004     Chart note from Redding Family Medical Group (Ex. 15F; CAR 323).

The doctor prepared another "Work Comp Progress Report."  Objectively, the doctor noted decreased range of motion of the neck, but normal reflexes and strength in the upper and lower extremities.  The doctor concluded that plaintiff would not be returning to work in her previous capacity.

April 25, 2005     Pain Questionnaire completed by plaintiff (Ex. 1E; CAR 65-7).

Plaintiff stated that her pain began in 1999 and that it is located in her right ankle, knee, thumb, fingers, and wrist, as well as the right and left elbows, left fingers, low back and neck.  She stated that the pain is constant and that medication helps relieve the pain, "but never takes it all away."  She stated she wears various braces to relieve the pain.  Plaintiff added that, due to pain, she does not do any activities and that she needs assistance to do grocery shopping, make her bed, vacuum, do laundry, and wash windows.  Plaintiff stated she is able to walk to the end of her driveway and back, can stand 20 minutes at a time, and can sit for varied, but unspecified, amounts of time.  She does light housekeeping chores and drives her own car.

June 2, 2005     Chart note from Redding Family Medical Group (Ex. 15F; CAR 322).

In another "Work Comp Progress Report" the doctor noted only mildly decreased range of motion with normal reflexes.

June 15, 2005     Treating physician's report by D. Brad Jones, M.D., of Shasta Orthopedics and Sports Medicine (Ex. 9F; CAR 278-80).

Dr. Jones concluded that plaintiff required surgery "at C5-6 and C6-7" based on "significant progression of her cervical DDD and stenosis from the 2003 films."

/ / /

/ / /

24

1      <u>July 1, 2005</u>          Treating physician's report by D. Brad Jones, M.D., of

2                                   Shasta Orthopedics and Sports Medicine (Ex. 9F; CAR 275-77).

3      Dr. Jones performed examinations of plaintiff's spine, right hip, left hip, and gait.

4  He reported: "This patient has been through an extensive non-surgical treatment program which

5  has been unsuccessful in curing her condition."  He concluded that plaintiff's hip condition

6  required a series of epidural injections and facet injections and that, if these failed to help,

7  plaintiff would require a decompressive surgery at L5-6.  He added that plaintiff, who was

8  smoking over a pack of cigarettes a day at the time, would have to quite smoking in order to

9  obtain the best post-operative results.

10      <u>July 14, 2005</u>        Orthopedic evaluation by agency examining doctor Rajeswari Kumar, M.D., of Cedarwood Medical Group

11                                   (Ex. 10F; CAR 281-87).

12      Agency examining doctor Rajeswari Kumar performed a complete orthopedic

13  evaluation of plaintiff.  He reported plaintiff's chief complaints as "neck pain, left upper

14  extremity pain, right ankle and knee pain, and lower back pain."  Dr. Kumar noted the following

15  history:

16      Right knee pain and right lower extremity pain:  The claimant reports that she had an injury to her right knee about 15 years ago.  She hit the right

17  knee against a hard object at work and there was acute pain and swelling.  She underwent arthroscopic surgery.  In addition, the claimant also had

18  medications and therapy and she reports that the pain became worse after the surgery, however, she was able to return to work.

19  

20  Neck and left upper extremity pain:  She had another work related injury in June 2001.  The chair she was sitting [in] collapsed and she fell.  She was seen by the doctor and she had x-rays and MRIs of the cervical and

21  lumbar spine.  She reports that she was diagnosed as having disc pathology and pinch nerve in neck and lower back.  She reports that she received

22  medications and conservative treatment.  She was able to return to work.  She subsequently received a replacement chair and that chair collapsed [in

23  2003] and she aggravated her neck pain.  She reports that she had repeat MRI of the cervical and lumbar spine and she has been receiving

24  medications for pain relief.

25  Low back pain:  The claimant reports that she was in a car accident in 1980 and she had back injury.  She underwent lower back surgery and she

26  reports that the symptoms improved and she was able to return to work.

She was able to do recreational sports.  After the fall in 2001 and 2003, her pain became progressively worse in the lower back and she recently had an MRI of the lumbar spine.  The pain in the lower back is constant and the pain radiates down to both lower extremities and reports that the pain in the neck is constant and radiates down to both upper extremities.

Left upper extremity pain:  The claimant reports that she had pain in the left elbows in 1999 and the underwent surgery for the ulnar nerve and at that time she reports that she had shaving of the medial epicondyle and since then she has experienced constant pain, paresthesias, and numbness in the left upper extremity.  She had also experienced numbness and paresthesias in the right arm.

Plaintiff reported to Dr. Kumar that the pain is constant, is aggravated by sitting, walking, bending, and lifting, and has not improved.  She told the doctor that she last worked on June 18, 2003, is independent in all activities of daily living, and is able to drive on her own.

On physical examination, Dr. Kumar noted the following objective findings:

1.      Plaintiff's gait was normal and nonantalgic, but plaintiff could not walk on heels and toes due to complaints of pain;

2.      No muscle spasm in the cervical spine, negative Spurling sign, but tenderness over the paraspinal region; range of motion was decreased;

3.      No spasm in the lumbar spine, but tenderness in the paraspinal region; range of motion was decreased;

4.      Negative straight leg raising bilaterally, both sitting and supine;

5.      Shoulder range of motion within normal limits on the rights, but slightly limited on the left; impingement sign, Yergason test, and drop-arm signs negative; no tenderness; normal strength;

6.      Elbow range of motion within normal limits on both sides; no reported elbow pain;

7.      Wrist range of motion within normal limits on both sides; no tenderness or effusion;

8.      Range of motion within normal limits in all fingers; no reported pain or tenderness and plaintiff was able to make a full fist and able to oppose her thumbs to the little finger and index finger;

9.      Hip range of motion within normal limits on both sides; Fabere test negative; no tenderness;

///

10.     Knee range of motion within normal limits on both sides; McMurray test and Lachman test negative; Drawer sign negative; no joint effusion; no tenderness at knee joint lines;

11.     Ankle range of motion within normal limits on both sides; and

12.     Motor strength normal in upper and lower extremities.

Dr. Kumar diagnosed neck pain and low back pain without radiculopathy but with restriction of range of motion and subjective pain on palpation along the medial aspect of the elbow.  Dr. Kumar provided the following functional assessment:

> Functional limitation is due to the objective findings of limited range of motion of the neck and lumbar spine and previous lower back surgery and limited range of motion of the left shoulder.  The claimant can lift and carry 25 pounds occasionally and 15 pounds frequently.  Standing and walking is six hours per day without assistive devise.  Sitting is unlimited as long as she has a proper back supportive chair.  There is no limitation with gripping and fine manipulative activities and no limitation with kneeling and climbing activity.  The claimant's age, gender, and stature are not counted while determining the limitations.

July 27, 2005        Orthopedic evaluation by Joel W. Renbaum, M.D., of Orthopedic Evaluation Center (Ex. 11F; CAR 289-91).

Dr. Renbaum provided another assessment following his review of additional medical records.  He stated that "[g]iven the progression of her symptoms and the degenerative changes noted on MRI, I have no objection to her proceeding with fusion at C5-6, C6-7. . . ."  he said the need for surgery is related to the June 2003 work injury which "resulted in a permanent aggravation of the underlying degenerative disc disease in her cervical spine."

August 1, 2005       Physical residual functional capacity assessment by agency consultative doctor C. Eskander, M.D. (Ex. 12F; CAR 292-99).

Agency consultative doctor Eskander opined that plaintiff could lift up to 20 pounds occasionally and up to ten pounds frequently.  He also found that plaintiff could sit, stand, and/or walk up to six hours in an eight-hour day, and that she was unlimited in her ability to push and/or pull.  The doctor felt that plaintiff could occasionally climb, kneel, crouch, and crawl, and frequently balance and stoop.  He noted no manipulative, visual, communicative, or

1  environmental limitations.

2          September 9, 2005      Chart note from Redding Family Medical Group (Ex. 15F;
3                                CAR 322).

4          In another "Work Comp Progress Report" the doctor noted no abnormal findings

5  of any kind.  He stated:  "We'll continue current regimen per [plaintiff's] request."

6          September 22, 2005     Disability assessment by William Harden M.D., of Redding
7                                Family Medical Group (Ex. 16F; CAR 321);.

8          Dr. Harden opined that plaintiff's "incapacity is permanent."  He stated:

9          Ms. Lawson was last examined by us on September 9, 2005, and
           previously on June 2, 2005.  Of note, she was seen July 1, 2005, and June
10         15, 2005, by Dr. Jones, an orthopedist in the area.  During those visits, Dr.
           Jones was recommending an anterior cervical fusion and epidural steroid
11         injections of the lumbar spine, and facet injections.  If these failed, a
           decompression surgery L5.  He notes that she had an extensive non-
12         surgical treatment.

13         At this point, I feel that she is incapable of returning to work, and judging
           by the information that I have, and her examination which includes
14         significant neck and back pain, I do not see her returning to work in the
           foreseeable future.

15

16         December 9, 2005      Chart note from Redding Family Medical Group (Ex. 15F;
17                               CAR 319).

18         In another "Work Comp Progress Report" the doctor indicated that plaintiff had

19 rejected surgery for her neck and back pain.  Plaintiff also rejected injections for pain control

20 despite the lack of progress with physical therapy and medication.  The doctor noted only

21 subjective complaints of pain and continued plaintiff's medications even though he indicated that

22 they were not providing relief.

23         March 9, 2006         Chart note from Redding Family Medical Group (Ex. 15F;
24                               CAR 319).

25         Plaintiff reported with increasing pain in her hands.  The doctor noted decreased

26 range of motion in the neck and decreased strength in both hands.

May 3, 2006            Electrodiagnostic evaluation by John A. Dorsett, M.D., of
                       Physical Medicine and Rehabilitation (Ex. 15F; CAR 314-
                       16).

Dr. Dorsett conducted electrodiagnostic studies of plaintiff's wrists and hands.
He reported abnormal findings and offered the following comments:

1.      Evidence of right-sided cubital tunnel syndrome. . .;

2.      Evidence of an underlying sensory peripheral neuropathy, involving
        bilateral median; and

3.      No concrete evidence of bilateral carpal tunnel syndrome.

June 15, 2006          Chart note from Redding Family Medical Group (Ex. 15F;
                       CAR 318).

The doctor completed another "Work Comp Progress Report" and noted that Dr.
Jones had recommended plaintiff for surgery and that, if she chose surgery, she would have to
stop smoking.  Plaintiff reported that she was "not ready to stop mentally at this point."  The
doctor continued plaintiff on her current medications.

September 15, 2006     Chart note from Redding Family Medical Group (Ex. 15F;
                       CAR 337).

As with the June 15, 2006, progress report, the doctor noted Dr. Jones'
recommendation for surgery but that plaintiff was "not interested in surgery nor stopping
smoking at this point."  The doctor indicated that plaintiff "[l]ast worked in 2004."[17]

December 18, 2006      Chart note from Redding Family Medical Group (Ex. 15F;
                       CAR 337).

In the final "Work Comp Progress Report" contained in the CAR, the doctor
noted plaintiff's complaint of only mild pain in her neck and little change in her low back pain.
Plaintiff's medication was continued.

_____

[17]     This is inconsistent with plaintiff's claim that she became totally disabled and
unable to work in June 2003.

### III.  STANDARD OF REVIEW

The court reviews the Commissioner's final decision to determine whether it is: (1) based on proper legal standards; and (2) supported by substantial evidence in the record as a whole.  See Tackett v. Apfel, 180 F.3d 1094, 1097 (9th Cir. 1999).  "Substantial evidence" is more than a mere scintilla, but less than a preponderance.  See Saelee v. Chater, 94 F.3d 520, 521 (9th Cir. 1996).  It is ". . . such evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 402 (1971).  The record as a whole, including both the evidence that supports and detracts from the Commissioner's conclusion, must be considered and weighed.  See Howard v. Heckler, 782 F.2d 1484, 1487 (9th Cir. 1986); Jones v. Heckler, 760 F.2d 993, 995 (9th Cir. 1985).  The court may not affirm the Commissioner's decision simply by isolating a specific quantum of supporting evidence.  See Hammock v. Bowen, 879 F.2d 498, 501 (9th Cir. 1989).  If substantial evidence supports the administrative findings, or if there is conflicting evidence supporting a particular finding, the finding of the Commissioner is conclusive.  See Sprague v. Bowen, 812 F.2d 1226, 1229-30 (9th Cir. 1987).  Therefore, where the evidence is susceptible to more than one rational interpretation, one of which supports the Commissioner's decision, the decision must be affirmed, see Thomas v. Barnhart, 278 F.3d 947, 954 (9th Cir. 2002), and may be set aside only if an improper legal standard was applied in weighing the evidence, see Burkhart v. Bowen, 856 F.2d 1335, 1338 (9th Cir. 1988).

### IV.  DISCUSSION

In her motion for summary judgment, plaintiff argues:  (1) the ALJ improperly failed to credit the opinions of her treating physician, Dr. Harden; (2) the ALJ improperly failed to credit her testimony; and (3) the ALJ relied on the vocational expert's answers to hypothetical questions which did not accurately reflect plaintiff's limitations and functional capabilities.

/ / /

1       **A.**    **Treating Physician's Opinions**

2          The weight given to medical opinions depends in part on whether they are

3 proffered by treating, examining, or non-examining professionals. See Lester v. Chater, 81 F.3d

4 821, 830-31 (9th Cir. 1995). Ordinarily, more weight is given to the opinion of a treating

5 professional, who has a greater opportunity to know and observe the patient as an individual,

6 than the opinion of a non-treating professional. See id.; Smolen v. Chater, 80 F.3d 1273, 1285

7 (9th Cir. 1996); Winans v. Bowen, 853 F.2d 643, 647 (9th Cir. 1987). The least weight is given

8 to the opinion of a non-examining professional. See Pitzer v. Sullivan, 908 F.2d 502, 506 & n.4

9 (9th Cir. 1990).

10          In addition to considering its source, to evaluate whether the Commissioner

11 properly rejected a medical opinion the court considers whether: (1) contradictory opinions are

12 in the record; and (2) clinical findings support the opinions. The Commissioner may reject an

13 uncontradicted opinion of a treating or examining medical professional only for "clear and

14 convincing" reasons supported by substantial evidence in the record. See Lester, 81 F.3d at 831.

15 While a treating professional's opinion generally is accorded superior weight, if it is contradicted

16 by an examining professional's opinion which is supported by different independent clinical

17 findings, the Commissioner may resolve the conflict. See Andrews v. Shalala, 53 F.3d 1035,

18 1041 (9th Cir. 1995). A contradicted opinion of a treating or examining professional may be

19 rejected only for "specific and legitimate" reasons supported by substantial evidence. See Lester,

20 81 F.3d at 830. This test is met if the Commissioner sets out a detailed and thorough summary of

21 the facts and conflicting clinical evidence, states her interpretation of the evidence, and makes a

22 finding. See Magallanes v. Bowen, 881 F.2d 747, 751-55 (9th Cir. 1989). Absent specific and

23 legitimate reasons, the Commissioner must defer to the opinion of a treating or examining

24 professional. See Lester, 81 F.3d at 830-31. The opinion of a non-examining professional,

25 without other evidence, is insufficient to reject the opinion of a treating or examining

26 professional. See id. at 831. In any event, the Commissioner need not give weight to any

1  conclusory opinion supported by minimal clinical findings.  See Meanel v. Apfel, 172 F.3d 1111,

2  1113 (9th Cir. 1999) (rejecting treating physician's conclusory, minimally supported opinion);

3  see also Magallanes, 881 F.2d at 751.

4         Plaintiff's claim relating to the ALJ's evaluation of treating medical opinions is

5  limited to the ALJ's analysis of Dr. Harden's opinion.  As to Dr. Harden, the ALJ stated:

6         Dr. Harden is the claimant's treating physician.  On September 22, 2005,
       Dr. Harden opined that claimant was incapable of returning to her past
7         work due to the disorders in the neck and back (Exhibit 16F/5).  Dr.
       Harden's opinion, however, is not supported by the opinions of Dr.
8         Wiedeman, Dr. Renbaum, Dr. Kumar, and the state agency consulting
       physician [Dr. Eskander].  While Dr. Harden is the claimant's treating
9         physician, his opinion is not supported by the weight of the medical
       evidence.  Therefore, I do not give controlling weight to the treating
10        physician opinion.

11  Plaintiff contends the ALJ erred by favoring the opinions of Drs. Wiedeman, Renbaum, Kumar,

12  and Eskander over those of her treating physician, Dr. Harden.  Specifically, she argues that all

13  the doctors agreed as to plaintiff's underlying impairments and that the opinions of Dr. Harden

14  and the other doctors differed only as to the degree of limitation imposed by plaintiff's

15  impairments.  Plaintiff also notes that Drs. Wiedeman and Renbaum opined that plaintiff could

16  return to work only with appropriate accommodation.  Plaintiff asserts that whether

17  accommodation would allow a return to past work is irrelevant in the social security context.

18  She concludes that, because all the doctors agreed as to the underlying impairments and only Dr.

19  Harden rendered an opinion in the context of the social security standard – whether plaintiff can

20  perform substantial gainful activity – his opinion should have been afforded controlling weight.

21         The court finds that the ALJ cited a valid reason for not accepting the opinions of

22  Dr. Harden – that they were not "supported by the weight of the medical evidence."  Accepting

23  plaintiff's contention that all the doctors agreed as to plaintiff's underlying impairments, they did

24  not all agree as to the limitations imposed by those impairments.  Here, the ALJ's reason for

25  rejecting Dr. Harden's contradicted conclusions as to plaintiff's limitations was specific and

26  legitimate.  The question is whether it is supported by substantial evidence in the record as a

32

whole.  In determining whether substantial evidence supports the ALJ's conclusion regarding Dr.

Harden, the court will discuss the doctors' opinions as to each of plaintiff's impairments.

       1.    <u>Hand/Wrist/Elbow</u>

Regarding plaintiff's upper extremity problems, the ALJ observed:

> Reliance on Dr. Wiedeman's medical opinion is based on his specialty in hand surgery.  While Dr. Wiedeman's assessment was provided for a workers compensation claim, his opinion was [as] an agreed medical examiner for the insurance carrier and claimant.  Dr. Wiedeman's opinion is supported by the January 2003 report of Joel W. Renbaum, M.D., who indicated that, "I do feel that she would be able to return to her usual and customary work activities if a few modifications were made for her as recommended by Dr. Wiedeman. . . ."  (Exhibit 8F/18).

> I note that on July 14, 2005, one year after Dr. Wiedeman's report, consultative examination report of Rajeswari Kumar, M.D,. reflected that claimant was status post probable medial epicondylitis and subjective pain on palpation along the medial aspect of the elbow that do not limit grip and fine manipulation (Exhibit 10F).  It would appear that claimant's limitations had decreased since July 2004 and rebuts claimant's position that she is limited to using only one hand.

The ALJ's analysis is supported by the record.  Specifically, Dr. Kumar observed that plaintiff's

wrist range of motion was within normal limits on both sides with no tenderness or effusion, that

her range of motion was within normal limits in all fingers with no reported pain or tenderness,

that plaintiff was able to make a full fist, that she was able to oppose her thumbs to the little

finger and index finger, and that motor strength was normal.  Dr. Kumar also noted that

plaintiff's wrist range of motion was within normal limits on both sides with no tenderness or

effusion.  Based on these findings, Dr. Kumar opined that plaintiff has no limitation with

gripping and fine manipulative activities and could return to work without modification.  The

ALJ's conclusion that plaintiff was not limited with respect to her hand is supported by Dr.

Kumar's report.  It is also consistent with Dr. Eskander's assessment that plaintiff has no

manipulative limitations.  Thus, regardless of whether Drs. Wiedeman and Renbaum opined that

plaintiff could return to work with modifications, Drs. Kumar and Eskander opined that plaintiff

required no modification for her hand.

1          With respect to plaintiff's right wrist and her contention that she is limited to the

2  use of only one (presumably the left) hand, other evidence supports the ALJ's conclusion that

3  plaintiff can in fact use both hands.  Dr. Wiedeman reported that, by February 2002, plaintiff had

4  been using a wrist splint which resulted in improvement in her pain symptoms.  He also reported

5  that, by October 2002, plaintiff was still working full duty and utilizing her right wrist.  In

6  October 2003, plaintiff told Dr. Wiedeman that the wrist splint had made a "big difference" and

7  resulted in diminished discomfort.  On November 3, 2003, Ms. Cresswell reported to Dr.

8  Wiedeman on plaintiff's progress following 13 of 24 pre-authorized physical therapy sessions.

9  Right wrist grip strength, which was initially eight pounds on September 24, 2003, had improved

10  to 20 pounds by October 6, 2003, and further improved to 25 pounds by the most recent session.

11  On November 26, 2003, plaintiff reported to Ms. Cresswell a reduction in right wrist ulnar pain.

12  On examination, Ms. Cresswell noted increased muscle tone in the wrist and range of motion

13  was 50% of expected normal (an increase from the last report following the 13th session, when

14  range of motion was 40% of expected normal).  From this it appears that from October 2002 –

15  when plaintiff was still working full duty using her right wrist – through November 2003 – after

16  she states she became unable to work – plaintiff's right wrist problems were steadily improving.

17          Even though Drs. Kumar and Eskander concluded that plaintiff has no limitation

18  associated with her hand and/or wrist, and other evidence supports the conclusion that she can

19  use both hands, the ALJ nonetheless gave plaintiff the benefit of some doubt.  Specifically, the

20  ALJ found that plaintiff is limited in her ability to "type more than twenty five minutes without a

21  five minute break from typing during [which time] she can perform other activities and [she is]

22  unable to pull files out from a file cabinet when the files are too close together."  Essentially, the

23  ALJ included in his residual functional capacity assessment the modifications and restrictions

24  recommended by Drs. Wiedeman and Renbaum.

25  / / /

26  / / /

34

Further, as to plaintiff's elbow in particular, the record simply does not establish any significant impairment or limitation.  On July 31, 2002, Dr. Wiedeman observed full active and passive range of motion in the right elbow, without effusion, instability, or crepitus.   The doctor also noted a well-healed surgical scar on the left elbow.  Dr. Wiedeman noted significant guarding of the medial elbow on the left.  On July 8, 2003, Dr. Harden observed full range of motion of the arms with tenderness in both wrists and the left elbow with normal reflexes.  On July 14, 2005, Dr. Kumar reported that plaintiff's elbow range of motion within normal limits on both sides.  Similarly, Dr. Eskander did not assign any limitations with respect to plaintiff's elbow in his August 1, 2005, residual functional capacity assessment.

As to Dr. Harden's September 22, 2005, opinion that plaintiff cannot return to work at all, the court finds that Dr. Harden's opinion is not supported by objective findings to the extent such opinion is due to upper extremity complaints, in combination with other problems.  A review of his chart notes referencing plaintiff's hand reveals inconsistent observations at best.  In July 2003 Dr. Harden noted tenderness in the wrists and generalized arthritis in the hand.  But, in July 2004 he noted full range of motion in the upper extremities and in December 2004 he noted normal strength in the upper extremities.  While he noted decreased range of motion in the hands in June 2005 and March 2006, in September 2005 Dr. Harden did not report abnormal findings of any kind.  These observations do not support the conclusion that plaintiff was precluded from all work due to problems with her hand.

For the foregoing reasons, the court finds that the ALJ properly rejected the opinion of Dr. Harden as to plaintiff's upper extremity.

2.   Neck/Back

Regarding plaintiff's neck and back, the ALJ stated:

The claimant has also been evaluated for neck and back pain.  An MRI report of September 2003 disclosed degenerative changes at the C5-6 and C6-7 level without any cord compression (Exhibit 3F).  Dr. Wiedeman reported in July 2004 that claimant had been evaluated by a Dr. Hartzog who diagnosed degenerative disc disease at the C5-6 and C6-7 levels

(exhibit 7F/29).  An April 2005 MRI report of the cervical spine disclosed mild central stenosis at the C5-6 and C6-7 levels with evidence of bilateral neural foraminal narrowing (Exhibit 11F).  In June 2005, the claimant was evaluated by D. Brad Jones, M.D., for worsening spinal pain.  On examination, Dr. Jones reported limitation of motion in the cervical spine with Spurling's test that provoked dysesthesia pain, decreased biceps tendon reflex, and decreased brachioradialis tendon reflex that were associated with the C5 and C6 distribution.  Motor function and sensation in the upper extremities were considered unremarkable.  In his report, Dr. Jones indicated that x-rays of the cervical spine were normal.  Dr. Jones diagnosed neck pain, not otherwise specified, cervical spondylosis without myelopathy, and spinal stenosis.  Surgery was recommended, however, the claimant declined.  Dr. Jones also recommended a series of epidural injections (Exhibit 9F).

With regard to the complaint of low back pain, an MRI report of March 29, 2004, revealed a posterior protrusion of the L1-2 and L5-S1 discs; degeneration of the L1-2, L4-5, and L5-S1 level; mild central canal stenosis and bilateral narrowing of the neural foramina at the L4-5 and L5-S1 levels; and anterior degenerative spurring at the L5-S1 level (Exhibit 6F).  Dr. Jones evaluated claimant for her back complaint associated with radiating symptoms to the lower extremities and reported in July 2005 that there was a healed surgical scar, normal neurological findings except for weakness in the extensor hallucis longus and positive Lasegue's.  After reviewing an MRI report, Dr. Jones diagnosed lumbar disc degeneration with spinal stenosis, sciatica, and low back pain.  Dr. Jones recommended a series of epidural injections and facet injections (Exhibit 9F).  Dr. Renbaum's July 2005 report includes reference to an April 29, 2005, MRI of the lumbosacral spine reflecting scattered changes of degenerative disc disease within the lumbar spine without evidence of significant neural foraminal narrowing, mild disc bulge at the L4-5 with probable superimposed tiny left neural foraminal annular tear, minimal left lateral recess stenosis at the L5-6 level, transitional vertebral body within the lower lumbar spine, disc bulging at the L1-2 level, and degenerative facet disease within the lower lumbar spine (Exhibit 11F).

Due to the degenerative changes in the cervical [neck] and lumbar [back] spine, I find that the claimant is limited in the ability to lift and carry.  Dr. Kumar provided a medical source statement indicating an ability to occasionally lift up to twenty five pounds, frequently lift/carry up to fifteen pounds, stand/walk for six hours in an eight hour day, and sit without limitation (Exhibit 10F).  I have relied on Dr. Kumar's opinion that is supported by the degenerative spinal changes.  Although the claimant complained of symptoms radiating to the upper and lower extremities, the clinical findings do not disclose significant motor, sensory, or reflex changes to further compromise the claimant's functional capacity.  Considering the MRI reports that show degenerative changes at multiple levels and giving the claimant the benefit of the doubt, I find that she is capable of occasional lifting up to twenty pounds and frequent lifting and/or carrying up to ten pounds.  I further find that the claimant's capacity for standing and/or walking is limited to six hours in an eight

1  hour day because of her subjective symptoms.  I also considered Dr.
2  Renbaum's opinion that the claimant was precluded from prolonged
   weight bearing.

3  Again, the court finds that this analysis is supported by the record, to which the ALJ cites

4  extensively.  In particular, Dr. Kumar found:  (1) no muscle spasm in the cervical spine, negative

5  Spurling sign, but tenderness over the paraspinal region; (2) range of motion was decreased in

6  the cervical spine; (3) no spasm in the lumbar spine, but tenderness in the paraspinal region;

7  (4) range of motion was decreased in the lumbar spine; and (5) negative straight leg raising

8  bilaterally, both sitting and supine.  These findings are consistent with Dr. Hartzog's conclusion,

9  as reported by Dr. Wiedeman on January 6, 2004, that plaintiff "would be capable of carrying out

10 her normal and usual work activities."  Additionally, both Drs. Kumar and Eskander agreed that

11 plaintiff could lift/carry 20 pounds occasionally and ten pounds frequently and sit/stand/walk six

12 hours in an eight-hour day.

13          As with plaintiff's hand and wrist, the ALJ gave plaintiff the benefit of the doubt.

14 Specifically, even though Dr. Kumar opined that plaintiff could lift/carry 25 pound occasionally

15 and 15 pounds frequently, the ALJ limited plaintiff to the lighter weights specified in Dr.

16 Eskander's assessment.  Similarly, although Dr. Kumar concluded that plaintiff's ability to sit

17 was unlimited with proper back support, the ALJ adopted Dr. Eskander's more limited

18 assessment that plaintiff could sit for up to six hours in an eight-hour day.  The ALJ also

19 included in his residual functional capacity finding a limitation to prolonged weight bearing.

20          Further, as with plaintiff's hand and wrist, Dr. Harden's chart notes do not reveal

21 objective findings to suggest total disability due to neck and/or back problems.  Dr. Harden's

22 chart note observations as to plaintiff's neck and back are as follows:

23  July 8, 2003          Full range of motion of the neck with tenderness posteriorly
                          in the mid cervical spine; tenderness in the paraspinous
24                        muscle areas of the lumbar spine.

25  October 8, 2003       Fair range of motion of the neck and tenderness in the low
                          back; reflexes were normal.
26

| | | |
|---|---|---|
| November 12, 2003 | | Decreased range of motion to flexion and extension of the neck and tenderness in the lower lumbar spine were noted; reflexes were found to be normal. |
| January 14, 2004 | | Decreased range of motion to flexion, extension, and side-to-side rotation of the neck with normal reflexes; tenderness in the posterior surface of the neck was noted. |
| March 1, 2004 | | Decreased range of motion in the neck was noted secondary to pain. |
| September 29, 2004 | | Decreased range of motion in the neck and tenderness in the lower back. |
| December 21, 2004 | | Decreased range of motion of the neck. |
| September 9, 2005 | | No abnormal findings of any kind. |
| March 9, 2006 | | Decreased range of motion in the neck. |
| December 18, 2006 | | Complaints of only mild neck pain. |

Dr. Harden consistently noted only decreased range of motion and tenderness with normal reflexes.[18]

For the foregoing reasons, the court finds that the ALJ properly rejected the opinion of Dr. Harden as to plaintiff's neck and back.

### 3. Shoulder

Regarding plaintiff's shoulder, the ALJ stated:

The right shoulder strain was diagnosed in January 2003 by Dr. Renbaum based on generalized tenderness and mildly limited motion that interfered with overhead work using the right dominant upper extremity. By December 2004, there was a positive impingement sign, but Dr. Renbaum did not alter his opinion of functional capacity of the right upper extremity (Exhibit 8F). In his July 2005 consultative examination report, Dr. Kumar found full range of motion with negative impingement sign and no tenderness. Strength was also full in the upper extremities (Exhibit 10F).

There is no evidence of ongoing treatment for the right shoulder strain, even after Dr. Renbaum diagnosed an impingement syndrome. By Dr. Kumar's examination report of July 2005, there were no significantly

---

[18]   Although, in July and October 2003 Dr. Harden noted "fair" and "full" range of motion of the neck, in September 2005 Dr. Harden noted no abnormal findings of any kind, and by December 2006 plaintiff complained of only mild neck pain.

1  |  abnormal medical findings to support a preclusion to overhead work.  I
2  |  find that the lack of aggressive medical care and Dr. Kumar's clinical
   |  signs do not support Dr. Renbaum's opinion.

3  The ALJ's decision not to include any limitations associated with plaintiff's shoulder strain is

4  supported by the record.  As the ALJ noted, plaintiff did not seek any medical care related to her

5  shoulder and by July 2005 Dr. Kumar found no abnormality.  Similarly, Dr. Eskander did not

6  note any functional limitations related to the shoulder.  A review of Dr. Harden's notes does not

7  reveal any specific mention of objective findings on examination of plaintiff's shoulder.

8  Therefore, to the extent Dr. Harden opined that plaintiff was disabled based on shoulder

9  problems, the ALJ properly rejected that opinion.

10  ####       4.    Knee

11  Regarding plaintiff's knee, the ALJ stated:

12  |  With respect to the right knee disorder, the medical evidence documents a
13  |  June 2003 trauma with an initial evaluation by Albert G. Lui, M.D., who
   |  found no significantly abnormal findings on examination and x-rays
14  |  (Exhibit 1F).  The claimant was subsequently under the care of Brian S.
   |  Edkin, M.D., whose September 2003 report indicated signs of tenderness
15  |  at the medial joint line with no limitation of motion or instability.
   |  Suspecting a meniscal tear, Dr. Edkin ordered an MRI that showed no
16  |  signs of any meniscal tear or "other anatomic abnormality" (Exhibit 2F/1).
   |  Due to persistent pain, an injection of medication was administered in
17  |  November 2003 to the right knee.  Dr. Edkin also noted during that
   |  medical visit that x-rays showed minimal joint space narrowing.  Dr.
18  |  Edkin believed that the history of meniscal pathology and findings on
   |  examination were consistent with painful plica and meniscal pathology but
19  |  no meniscal tear.  When seen in November 2004, Dr. Edkin found
   |  patellofemoral irritation, exquisite tenderness over plica, light crepitance,
20  |  and normal stability (Exhibits 2F and 4F).  Dr. Renbaum's January 2003
   |  report described the claimant's use of a knee brace and clinical findings in
21  |  the right knee including tenderness and trace grating on the undersurface
   |  of the patella with no instability or effusion.  In Dr. Renbaum's opinion,
22  |  the right knee problem precluded prolonged weight bearing and repetitive
   |  kneeling and squatting.  Dr. Renbaum found no significant change on
23  |  physical examination in December 2004 and imposed the same functional
   |  imitations but added that the claimant should avoid repetitive climbing
24  |  (Exhibit 8F).  Dr. Kumar's consultative examination report of July 2005
   |  noted that the claimant was status post left knee arthroscopy without any
25  |  acute joint pathology (Exhibit 10F).

26  ///

> I find that the claimant is precluded from repetitive kneeling, climbing, crouching, and crawling that could aggravate the degenerative changes in the knee, but retains the ability for such functions on an occasional basis. This is based on the abnormal medical findings, the history of arthroscopic surgery, and the opinion of Dr. Renbaum.  Based on the absence of significantly abnormal findings, claimant is also capable of standing and/or walking for six hours in an eight hour day.  The claimant has also received only conservative and symptomatic care for knee that is also consistent with my finding.

Again, the court finds that this analysis is supported by the record.  As the ALJ noted, Drs. Renbaum and Edkin observed only minor objective clinical observations concerning the knee. Dr. Kumar did not assess any limitations associated with the knee.  As with the problems discussed above, the ALJ gave the plaintiff the benefit of the doubt and adopted Dr. Eskander's more limited functional assessment that plaintiff was precluded from all but occasional kneeling, climbing, crouching, and crawling.  Further, the ALJ's assessment that plaintiff could stand and/or walk for six hours in an eight hour day is supported by the conclusions reached by Drs. Kumar and Eskander.  To the extent Dr. Harden opined that plaintiff's knee problem precluded all work, the ALJ properly rejected this opinion because it is not consistent with the objective findings of record.  For his part, Dr. Harden did not report any of his own objective findings regarding the knee.

### 5. Ankle

Regarding plaintiff's ankle, the ALJ stated:

> Dr. Renbaum also evaluated the claimant's complaint of right ankle pain and diagnosed a strain with anterolateral joint line.  It was Dr. Renbaum's opinion that there was no indication of functional loss but that functional capacity should be based on subjective and objective factors.  When seen in December 2004, there was mild tenderness over the medial and lateral joint line but no change with respect to functional capacity (Exhibit 8F).

> Based on Dr. Renbaum's opinion, I find that there is no further loss of ability for work activity due to the right ankle strain.  There is no evidence of ongoing medical attention for the right ankle or more significantly abnormal medical findings to support a further loss of functional capacity.

/ / /

/ / /

1  This assessment is consistent with the record in general and Dr. Renbaum's findings in

2  particular.  As for Dr. Harden, his chart notes do not reveal any objective findings related to

3  plaintiff's ankle.  To the extent Dr. Harden opined that plaintiff is unable to work due to ankle

4  strain, the ALJ properly rejected such an opinion.

5  **B.**      **Plaintiff's Credibility**

6              The Commissioner determines whether a disability applicant is credible, and the

7  court defers to the Commissioner's discretion if the Commissioner used the proper process and

8  provided proper reasons.  See Saelee v. Chater, 94 F.3d 520, 522 (9th Cir. 1996).  An explicit

9  credibility finding must be supported by specific, cogent reasons.  See Rashad v. Sullivan, 903

10  F.2d 1229, 1231 (9th Cir. 1990).  General findings are insufficient.  See Lester v. Chater, 81 F.3d

11  821, 834 (9th Cir. 1995).  Rather, the Commissioner must identify what testimony is not credible

12  and what evidence undermines the testimony.  See id.  Moreover, unless there is affirmative

13  evidence in the record of malingering, the Commissioner's reasons for rejecting testimony as not

14  credible must be "clear and convincing."  See id.; see also Carmickle v. Commissioner, 533 F.3d

15  1155, 1160 (9th Cir. 2008) (citing Lingenfelter v Astrue, 504 F.3d 1028, 1936 (9th Cir. 2007),

16  and Gregor v. Barnhart, 464 F.3d 968, 972 (9th Cir. 2006)).

17              If there is objective medical evidence of an underlying impairment, the

18  Commissioner may not discredit a claimant's testimony as to the severity of symptoms merely

19  because they are unsupported by objective medical evidence.  See Bunnell v. Sullivan, 947 F.2d

20  341, 347-48 (9th Cir. 1991) (en banc).  As the Ninth Circuit explained in Smolen v. Chater:

21              The claimant need not produce objective medical evidence of the
             [symptom] itself, or the severity thereof.  Nor must the claimant produce
22              objective medical evidence of the causal relationship between the
             medically determinable impairment and the symptom.  By requiring that
23              the medical impairment "could reasonably be expected to produce" pain or
             another symptom, the Cotton test requires only that the causal relationship
24              be a reasonable inference, not a medically proven phenomenon.

25  80 F.3d 1273, 1282 (9th Cir. 1996) (referring to the test established in
   Cotton v. Bowen, 799 F.2d 1403 (9th Cir. 1986)).

26

The Commissioner may, however, consider the nature of the symptoms alleged, including aggravating factors, medication, treatment, and functional restrictions.  See Bunnell, 947 F.2d at 345-47.  In weighing credibility, the Commissioner may also consider: (1) the claimant's reputation for truthfulness, prior inconsistent statements, or other inconsistent testimony; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; (3) the claimant's daily activities; (4) work records; and (5) physician and third-party testimony about the nature, severity, and effect of symptoms.  See Smolen, 80 F.3d at 1284 (citations omitted).  It is also appropriate to consider whether the claimant cooperated during physical examinations or provided conflicting statements concerning drug and/or alcohol use.  See Thomas v. Barnhart, 278 F.3d 947, 958-59 (9th Cir. 2002).  If the claimant testifies as to symptoms greater than would normally be produced by a given impairment, the ALJ may disbelieve that testimony provided specific findings are made.  See Carmickle, 533 F.3d at 1161 (citing Swenson v. Sullivan, 876 F.2d 683, 687 (9th Cir. 1989)).

As to plaintiff's credibility, the ALJ stated:

My finding of the claimant's functional capacity is also based on an evaluation of the subjective complaints.  At the hearing, the claimant complained of back and leg pain with numbness in her upper and lower extremities.  She estimated she could sit for twenty minutes before experiencing neck and back pain that radiates to her extremities.  She described constant numbness on the bottoms of her feet making walking difficult.  According to the claimant, she can walk for about twenty minutes or less.  In the claimant's estimation, she can stand for about fifteen to twenty minutes at a time.  As a result of her limited capacity for standing, walking, and sitting, the claimant stated she lays down for most of the day in a recliner.  She also elevates her legs to assist in relieving her leg pains.  The claimant also indicated she is able to lift about five pounds because of her back and neck pain.  She stated she has difficulty gripping and finds that her hand shake.  With respect to daily activities, the claimant testified that her husband does the cooking and shopping because she is unable to stand, lift, bend, and walk.  She stated that she does not vacuum.

There are medical disorders to account for the subjective complaints but I do not find that the alleged severity and limitations are entirely credible.  According to the claimant's testimony, her daily activities are vary limited.  Her testimony is consistent with an undated disability report prepared by the claimant.  I find, however, that the medical evidence does not support

42

1    the severe discomfort and limitations claimed.  The functional loss
     indicated by the reporting physicians is not consistent with the claimant's
2    testimony of her severe pain and limitations.  Nor does the nature of her
     medical regimen support her testimony.  The claimant has pursued only
3    conservative medical care.  Surgical intervention was recommended and
     declined.  The claimant also declined epidural injections.  While she may
4    have concerns about such aggressive and acute care, I find that the medical
     attention provided does not validate the extent of her pain and limitations.
5    Therefore, I find that the evidence as a whole fails to support the alleged
     intensity, persistence, and functionally limiting effects of the subjective
6    complaints.

7    Plaintiff argues that there is no evidence of malingering and that, because the ALJ conceded that

8    the record documents medical findings which could produce plaintiff's pain symptoms, she met

9    the Cotton test.  Plaintiff concludes that the ALJ failed to provide clear and convincing reasons

10   for discrediting her testimony.  Specifically, plaintiff states:

11              Contrary to the ALJ's assertions, the medical record thoroughly
     documented Ms. Lawson's  extensive, consistent, and medically
12   appropriate treatment.  For example, her medical treatment consisted of
     analgesic and anti-inflammatory pain medication (Celebrex, Darvocet and
13   Norco), medication to help her sleep (Ambien), a corticosteroid injection
     to her right knee with short term incomplete pain relief, wrist and thumb
14   splints, physical therapy, as well as left knee arthroscopic surgery and left
     ulnar nerve neurolysis with medial epicondylectomy.  Back surgery and
15   epidural injections were also recommended but Ms. Lawson declined to
     undergo these further procedures due to her reasonable fear that they
16   would not work.  Indeed, Dr. Jones told her that the back surgery might
     not be successful.  TR 376.  Ms. Lawson's testimony regarding her pain
17   and functional limitations was consistent with her prescribed medical
     treatment as well as the opinion of her treating physician, Dr. Har[den],
18   that she was incapable of work.  Accordingly, the ALJ's stated reasons for
     rejecting Ms. Lawson's testimony regarding her pain and functional
19   limitations were without merit.

20              The court disagrees with plaintiff's contention that her testimony of debilitating

21   pain is consistent with the medical treatment she chose to follow.  In particular, it does not

22   appear that plaintiff declined surgery due to a fear that it would not provide pain relief.  The court

23   notes that plaintiff refused Dr. Jones' repeated recommendation for surgery and/or injections to

24   treat her back pain, and the reason why she did so.  Dr. Harden's chart notes from December 9,

25   2005, indicate that plaintiff rejected injections for pain control and/or surgery, despite the lack of

26   progress with physical therapy and medications.  Chart notes from June 15, 2006, and September

15, 2006, reveal why.  Specifically, plaintiff told Dr. Harden on both occasions that she did not want surgery, which would require her to temporarily quit smoking, because she was "not ready to stop mentally at this point" and not interested in "stopping smoking at this point."  It is logical to conclude that, if plaintiff experiences totally disabling pain due to her back problems, she would be willing to temporarily stop somking in order to undergo surgery which has the potential to eliminate her pain.  While it is apparent that plaintiff does in fact experience some pain, if her pain is not severe enough to cause her to stop smoking it follows that the pain is also not disabling.

Further, as the ALJ noted and as discussed in detail above, the objective evidence does not indicate any significant limitations.  Therefore, while plaintiff suffers from impairments which reasonably cause pain, her subjective testimony of disabling pain is inconsistent with the minimal limitations imposed by the impairments.  This conclusion is supported by inconsistencies with respect to plaintiff's statement in her disability application that she became unable to work in June 2003.  Specifically, on August 5, 2003, Dr. Wiedeman reported that plaintiff "has continued to work at her usual and customary duties following the work preclusions as were outlined and as refined in response to the letters from . . . the labor representative from UPEC," suggesting that she was still working as of August 2003.  On September 11, 2003, plaintiff reported to Dr. Harden that she experiences pain when working on the computer, suggesting that she was working as of September 2003.  On May 22, 2004, plaintiff reported to Dr. Renbaum that she last worked on July 8, 2003.  On September 15, 2006, Dr. Harden indicated in his chart note that plaintiff "[l]ast worked in 2004."  If plaintiff was still working as late as 2004, her pain was not disabling in June 2003

/ / /

/ / /

/ / /

/ / /.

44

1  C.  **Hypothetical Questions**

2  Hypothetical questions posed to a vocational expert must set out all the

3  substantial, supported limitations and restrictions of the particular claimant.  See Magallanes v.

4  Bowen, 881 F.2d 747, 756 (9th Cir. 1989).  If a hypothetical does not reflect all the claimant's

5  limitations, the expert's testimony as to jobs in the national economy the claimant can perform

6  has no evidentiary value.  See DeLorme v. Sullivan, 924 F.2d 841, 850 (9th Cir. 1991).  While

7  the ALJ may pose to the expert a range of hypothetical questions, based on alternate

8  interpretations of the evidence, the hypothetical that ultimately serves as the basis for the ALJ's

9  determination must be supported by substantial evidence in the record as a whole.  See Embrey v.

10  Bowen, 849 F.2d 418, 422-23 (9th Cir. 1988).

11  Plaintiff argues:

12  As briefed above, the ALJ did not have specific and legitimate
reasons for rejecting the limitations to which Ms. Lawson testified, such as
13  her inability to sit more than 20 minutes at a time, need to elevate her legs,
need to recline during the day, and manipulative limitations.  Nevertheless,
14  the ALJ failed to include these limitations in his ultimate residual
functional capacity finding.  Had these limitations been properly included
15  in the ALJ's RFC finding, a finding of disabled would have necessarily
followed based on the VE's testimony.

16

17  For the reasons discussed above, the court finds that the ALJ properly assessed plaintiff's

18  residual functional capacity and properly rejected plaintiff's testimony.  Therefore, the

19  hypothetical question and vocational expert's answer were valid.

20  / / /

21  / / /

22  / / /

23  / / /

24  / / /

25  / / /

26  / / /

## V.  CONCLUSION

Based on the foregoing, the court concludes that the Commissioner's final decision is based on substantial evidence and proper legal analysis.  Accordingly, IT IS HEREBY ORDERED that:

1.    Plaintiff's motion for summary judgment (Doc. 19) is denied;

2.    Defendant's cross-motion for summary judgment (Doc. 20) is granted; and

3.    The Clerk of the Court is directed to enter judgment and close this file.


DATED:  December 10, 2008

_____
**CRAIG M. KELLISON**
UNITED STATES MAGISTRATE JUDGE